UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RECEIVED

SEP 1 9 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

Mc.HARRIS

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

vs.

Wexford Health Sources, Kevin
Holloran Wex. Ceo, Dr. Louis
Shiker, Williams, Lamb,
Calloway, Jerry Daley, Garcia,
Brown-Reed, Duffield, Obasi
unnamed Defendants

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

C_____
(T_____

1:16-cv-9077
Judge Gary Feinerman
Magistrate Judge Susan E. Cox
PC6

CHECK ONE ONLY:

✓    COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
U.S. Code (state, county, or municipal defendants)

_____    COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
28 SECTION 1331 U.S. Code (federal defendants)

_____    OTHER (cite statute, if known)

BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY.

I.    Plaintiff(s):

    A.    Name:    M.C. Harris

    B.    List all aliases:    _____

    C.    Prisoner identification number:    #A 25088

    D.    Place of present confinement:    Stateville Corr. Ctr.

    E.    Address:    P.O. Box 112  Joliet IL 60434

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II.    Defendant(s):

(In A below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in B and C.)

    A.    Defendant:    Wexford Health Sources Inc.

        Title:    Agency Healthcare Provider for IDOC

        Place of Employment:    headquarted in Pennsylvania operating in Illinois IDOC

    B.    Defendant:    Kevin Holloran

        Title:    Wexford C.E.O.

        Place of Employment:    Pittsburg Pennsylvania, 15220-2751, 381 Mansfield Ave. Ste. 205

    C.    Defendant:    Louis Schicker

        Title:    Agency Medical Director

        Place of Employment:    Thompson Center 100 W. Randolph Ste 4-200

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

2

D. Defendant: Tarry Williams
   Title: Warden
   Place of Employment: Stateville

E. Defendant: Nicholas Lamb
   Title: acting Warden
   Place of Employment: Stateville

F. Defendant: Colloway
   Title: assistant Warden of Programs
   Place of Employment: Stateville

G. Defendant: Jerry Daley
   Title: Cheif Engineer
   Place of Employment: Stateville

H. Defendant: Cynthia Garcia
   Title: Director of Nurses
   Place of Employment Stateville

I. Defendant: Royce Brown-Reed
   Title: Health Care Unit Administrator
   Place of Employment: Stateville

J. Defendant: Nicolette Duffield
   Title: Health Care Unit Administrator
   Place of Employment: Stateville

K. Defendant: Saleh Obaisi
   Title: Medical Director
   Place Of Employment: Stateville

L. Defendants: Yet To Be Named
   Title: Nurses/Medtechs
   Place of Employment: Stateville

III.    List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:

    A.    Name of case and docket number: _____

_____

    B.    Approximate date of filing lawsuit: _____

    C.    List all plaintiffs (if you had co-plaintiffs), including any aliases: _____

_____

_____

_____

    D.    List all defendants: _____

_____

_____

_____

    E.    Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____

_____

    F.    Name of judge to whom case was assigned: _____

_____

    G.    Basic claim made: _____

_____

_____

    H.    Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____

_____

_____

    I.    Approximate date of disposition: _____

IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.

# IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

a.) Plaintiff filed Emergency Grievance on 9/28/15 #4049
grievance was not actually filed under emergency but the counselor
checked emergency a forwarded to the Warden who denied the
grievances (see EXH-"B" ) 10/8/15

(b) Plaintiff appealed the denial and forwarded the grievance to
the ARB on 10/22/2015. Per. Administrative Code Sec 504.850 Appeals (f)
the ARB is to respond in 6 months. It has been almost a year (see
out going legal mail printout. - EXH "A")

(c) Per Glick v. Walker, 385 Fed (2010) it states that state prisoner
need not resubmit his grievance to grievance officer to exhaust. In
Thornton v. Snyder, 128 F. 3d 696,694 (7th Cir. 2005) no obligation to
resubmit emergency grievance. Plaintiff has exhausted, every
"AVAILABLE REMEDIES".



# V STATEMENT of CLAIM

## COUNT I.

Defendants Wexford Health Sources Inc., Kevin Halloran, Dr. Louis Shicker, Dr. Obasi, John & Jane Doe nurses (1 through 7) Warden Lamb and Jerry Daley and unnamed Defendants

1.) Plaintiff has been subjected to the denial of his serious medical needs by the above named Defendants which constitutes deliberate indifference for his ongoing pain and suffering that amounts to a violation of the 8th amendment of the U.S. Constitution, and is cruel and unusual punishment.

2.) Plaintiff contends that on or about the first week of August, his health began to fail. He began to feel very ill and extremely tired. He immediately began to complain to the John & Jane Doe nurses who pass out morning med's on the 7/3 shift

3.) These nurses refused to assist the plaintiff in anyway, and stated plainly there was nothing they could do from a medical standpoint for the plaintiff, while observing the obvious labored breathing while each passing day plaintiff's condition got worse and worse as it became harder and harder for the plaintiff to breath. Finally on 8/13/2015 not long after the nurse passed out meds, Plaintiff was so weak while attempting to get out of bed to try and use the toilet he collapsed urinating and deficating on his-self. (there may be issues with exact date — medical records have been refused to be provided)

4.) Plaintiff regained conciousness as his cell-mate came to his aid asking him was he okay, an elderly inmate who suffers from damentia help plaintiff sit on the toilet and clean his self up. Plaintiff cell mate spoke with the gallery officer who called for a med tech who's response

7

was to tell the officer to notify plaintiff he'd be called for sick call the next day. Plaintiff passed out again and awoke to his cell mate, and neibors banging on the bars for a med-tech.

5.) Plaintiff had passed out to the next shift. C/o Norman came promptly to the cell and immediately notified his supervisor acting Sgt. C/o. Boton who called Healthcare, no med. staff ever came but the plaintiff was told he was going to the health care unit. the plaintiff barely made it 20 feet outside of his cell before almost collapsing again. Plaintiff barely made to the ground floor where c/o Boton order that the plaintiff be placed in a wheel chair and escorted to the Health Care Unit.

6.) When the plaintiff got to the Health Care Unit (HCU) he was placed in a cell, he was examined until the next day because there was no Doctor at Stateville. The plaintiff did not believe he would make it through the night, it felt like he was going to die. The next day when he was seen by a Doctor he was immediately rushed to the outside Hospital.

7.) According to the nurse at the outside Hospital plaintiff looked like he was going to die, the nurse at St. do's asked whats wrong? The plaintiff replied weakly that he hurt and felt real bad. After being hooked up to IVS and having alot of blood taken, Plaintiff was suddenly rushed to U.I.C. in an ambulance.

8.) Plaintiff arrived at U.I.C. and was placed in the I.C.U. where more IV's, blood drawn, and plaintiff was forced to slob in a cup. Day later plaintiff awoke to several Doctors standing around his hospital bed

8

this was the first time plaintiff was told he had Legionairres Desease, and had suffered a collapsed lung and was in a very bad advanced stage of pneumonia, he was told he was lucky to be alive at his age. Plaintiff had no knowledge at this time that the very same Desease had killed several senior citizens in a Quincy IL. old folks home. The U.I.C. doctors stated, had Stateville waited another day getting the plaintiff treated, plaintiff might not have had a fighting chance.

9). Plaintiff stayed in I.C.U. for a few more days and was moved to another room where he stayed for a few more days constantly have his vitals checked, blood drawn while hooked up to IV's. Plaintiff was discharged from the UIC. on 8/21/2015. Plaintiff was taken back to Stateville and housed in the infirmory until 9/16/2015, where he was hooked to a breathing machine and recieved breathing treat-

10). While Plaintiff was housed in the Stateville infirmory Warden Lamb came and looked at the plaintiff from outside the cell and made a phone call, and began to say that, " yes — he's alive (as in disbelief) I'm looking right at him." Later plaintiff learned that stateville had listed him as being dead and had to retrieve his prison Id from the front gate where the Id's of dead inmates are kept.

11.) Plaintiff was finally discharged and sent to general population with an asthma pump, there has been some follow ups, a chest x-ray and a visit to St. Jo's hospital where the plaintiff was told that it would be six months before he'd see any signs of recovery, and that only then could a determination be made on wheather plaintiff would make a full recovery. The plaintiff also recieved a tetnis and pneumonia shot.

9

12). Plaintiff's condition even made the news, and according to an article by Dawn Rhodes entitled, "Stateville inmate diagnosed with Legionnaires disease, the bacteria is commonly found in plumbing and water systems like Statevilles. The showers were quaranteened and were not reopened until the plaintiff returned to D-house. Copyright © 2015 Chicago Tribune. The news also reported that the old folks home in Quincy IL. spent 5 million dollars to put a new water system in after their outbreak. Statevilles only changed the shower heads (See Exh. C)

13). Stateville is well aware for a number of years that the water system is hazardous and warns staff and visitors not to drink it. But, forces inmates and myself to ingest the brown foul smelling water. See 8/11/2015 order and Staff only Legionaires memo (Exh. D-E). There are memos dating back to 12/3/2003 Warden Bulletin. No. 2003-118 (Exh. F)

14). On 5/8/2008 the Illinois Enviromental Protection Agency ordered Stateville to respond to their findings that was due in 45 days. The findings were that the water was stagnet and would breed bacteria. That bacteria almost killed the plaintiff. It was a failure to protect plaintiff when the water system was ignored instead of being corrected also given rise to dozens inmates with identical symptoms.

15). The mold and overall filth in the shower area and cell house and Stateville as a whole being in total disrepair is another major contributing factor in the breeding of desease and plague with roaches, mice and ground hogs running rampant. This entire

situation could have been prevented had the conditions at Stateville not been deplorable and inhumane, and volitile to the 8th & 14th amend. to the U.S. Const. Warden Lamb, Jerry Daley. any acting Wardens.

16). Kevin Holloran, Wexford CEO. and Dr. Louis Schicker, Agency Medical Director for I.D.O.C. healthcare providers also Dr. Obasi Stateville Medical Director are in breach of there contract violating the plaintiffs 8th and 14th amend's of the US Const. where they failed to have a Doctor on the premises at all times, or on call. No Doctor ever came and plaintiff had to wait to the next day until a Doctor decided to come to work. Plaintiff almost died and barely made it through the night before it was realized he needed to be sent out to be seen by specialist. See Wexford Health Sources incorporated, "Level of Community Care", See Also Emergency Service -- the attending nurse should have made the call to send the plaintiff out but according to nurses they cant because Dr. Obasi wont allow them, because he believes inmates just want to ride to the hospital and see the outside. See also Infirmary Care, not a substitute for ICU (Provider Handbook). See Exh. "G".

"WEXFORD. medicine in corr. Prison Operations and procedures Policy No.: p 112 Emergency Services -- policy (24) hour emergency medical services, ect. -- 1.) physician available 24 hours a day 7 days a week

Violating this rule almost cost plaintiff his life.

17.) These nurses who ignored plaintiffs serious medical condition

shows that the plaintiff did not recieve medical care that is equal to that available in the local community as promised by Wexford, See Level of Community Care. these nurse were deliberately indifferent towards the plaintiff in belaying his medical treatment. EXH - G

## COUNT 2

18). Kevin Holloran Wexford C.E.O. and Louis Schicker are in a direct supervisory capacity over Dr. Obasi and the medical staff at Stateville and is well aware of his conduct in failing to provide quality medical treatment as countless lawsuits continue to be filed against Obasi and his staff, where it is business as usual for an inmate to be close to death before he is allowed to be sent out to see a specialist. The plaintiff would also point out that this is Wexfords M.O. statewide (see Wexfords Rap Sheet EXH "H") One can easily make an argument that this is Wexfords M.O. nationwide. In fact Wexford encourages these inhumane actions through their policies which are contridictory to there contract (See Wexford provider handbook "Level of Community Care", "Both by contract and by decree of the federal court, corrections department must provide inmates' medical care that is equal to that available in the local community". EXH G

19). Yet this conduct is encouraged in a policy in the same Wexford handbook (See Cost Considerations EXH. G): Cost has always been a consideration in treatment. the Rapsheet shows this practice is customary for Wexford an its employees. Thus Wexford by and through its employees systematically violates plaintiffs 8th and 14th amendments, deliberate

indifference and equal Protection of the Law.

20). Wexford CEO Holloran, and Louis Schicker failed to provide plaintiff with any proper medical care in violation of the 8th amend, as a result of all named and unnamed defendants injustified and' unconstitutional conduct plaintiff experienced pain, suffering, emotional distress, embarrassment and injury almost to the point of death.

21). This misconduct described in this count and throughout this complaint was objectively unreasonable and undertaken intentionally, with malice, and or with reckless indifference to plaintiffs rights.

22.) Alternatively, Defendants were deliberately indifferent to Mr. Harris objectively serious medical needs, and their actions were under taken intentionally, with malice, and or with reckless indifference to plaintiffs rights. Plaintiffs injuries were proximately caused by conditions, policies and practices of Defendants.

23). Prior to the events giving rise to Plaintiffs Complaint, Defendants Wexford had notice of widespread policies and practices by healthcare and correctional employees at Stateville pursuant to which prisoners like Plaintiff with serious medical needs were routinely denied medical care. It is common at Stateville to see prisoners with clear symptoms of serious medical needs who repeatedly request medical evaluation or treatment, and whose request are routinely delayed or completely ignored by healthcare and correctional employees. Despite knowledge of these problematic policies and practices, Defendant Wexford did nothing to ensure that prisoners at Stateville received adequate medical

care, and access to medical care, thereby acting with deliberate indifference.

## PRAYER FOR RELIEF

Wherefore, plaintiff requests that the Court grant the following relief:

A. Issue a Declaratory Judgment stating that:

1.) there exist widespread policies or practices at Stateville pursuant to which plaintiff and all prisoners recieve unconstitutional health care, including policies and practices pursuant which: (a) healthcare personnel commonly fail to respond or respond inadequately to prisoners who have requested medical attention or medication, or asked to see a doctor: (b) healthcare personel commonly fail to respond or respond inadequately to prisoners and specifically the plaintiff who exhibit obvious signs of a serious medical condition: (c) healthcare personnel commonly fail to perform adequate examinations of prisoners with a serious medical condition as in the case of the plaintiff: (d) healthcare personel with inadequate training, qualifications, and experience are charged with the responsibility of screening and evaluating prisoner complaints and requests for medical care: (e) healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even when an outside referral is necessarry or proper before a plaintiff is near death: (f) inadequate levels of healthcare staffing are maintained.

2.) That these widespread policies and practices were allowed to flourish because Defand Wexford and its supervisor agents, which directs the provisions of health care at Stateville directly encourage

the very type of conduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct. In this way, Defendants Wexford and its agents violated Mr. Harris's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations, by Wexford, Holloran, Schickler, Obasi, Garcia, Brown-Reed, Duffield and other unnamed medical staff.

3). That at all times relevant to this case the involved Defendants Williams, Lamb, Calloway were responsible for the creation, implementation, oversight, and supervision of policies, practices and procedures regarding plaintiffs access to constitutionally adequate healthcare at Stateville; the training of IDOC staff on providing prisoners access to medical care; and the supervision of IDOC staff at Stateville including but not limited to Jerry Daley Cheif Engineer responsible for the overall maintenance of Stateville's water and sanitation that cause this injury violating plaintiffs rights.

B. Issue an injunction ordering Defendants who have the authority Wexford/IDOC or its agents to:

    1.) Immediately arrange for the plaintiff to be seen by a specialist because he continues to suffer from painful side/alter effects from the dangerous disease loss of feeling and numbness in his legs and breathing problems.

    2) Carryout without delay the treatment by such specialist.

C. Award Damages Compensatory and Punitive against all Defendants

D. Grant such relief the Court deems the plaintiff is entitled to: Jury Trial Demanded

## DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief and that I was assisted by a jail house lawyer who prepared my grievance and lawsuit after sitting with me and taking note because I struggle with reading and I have motor skill issues due to mental health meds (tremors).

Date 9-11-16

/s/ MC Harris
MC. Harris #A-25088
Stateville C.C. P.O.B. 112
Joliet IL 60434

prepared by a Jail House Lawyer "JP"

16

EXH - A

2015   A25088   HARRIS   MC   10/22/2015   ADMINISTRATIVE REVIEW BOARD   PO BOX 19277   SPRINGFIELD   IL

EXH-B-8

ILLINOIS DEPARTMENT OF CORRECTIONS
OFFENDER'S GRIEVANCE

D3500    D356

GRIEVANCE OFFICE

| Date: 9/28/15 | Offender: (Please Print) MC. Harris | ID#: A-25088 |
|---|---|---|
| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): Mohamend, twins Hazard- deplorable. conditions of confinement

4049

- [ ] Disciplinary Report: ____/____/____ Date of Report _____  Facility where issued _____

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
  **Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
  **Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
  **Chief Administrative Officer,** only if EMERGENCY grievance.
  **Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** On or about the first week of August I began to feel very sick and fatigue. I immediately began to complain to the 7/3 shift nurse who passes out the meds first thing in the morning.

The nurse(s) refused to assist me in any way, and stated plainly there was nothing "THEY" medically could do for me. While everyday my condition got worse and it became harder and harder for me to breath until finally on the morning of 8/15/2015 I got out of bed to try and use the toilet and I collapsed urinating and deficating on myself.

**Relief Requested:** ① Per 504.830 Grievance Procedures (d) I recieve the decision in writing within 2 months after you recieve this grievance ② And that per 504.850 Appeals I recieve a response from Springfield within 6 months →

- [x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Harris | A-25088 | 9-28-15 |
|---|---|---|
| Offender's Signature | ID# | Date |

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: 9 / 30 / 15

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

| Print Counselor's Name | Counselor's Signature | Date of Response |
|---|---|---|

---

**EMERGENCY REVIEW**

Date Received: 10 / 8 / 15

Is this determined to be of an emergency nature?

- [ ] Yes; expedite emergency grievance
- [x] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Date: 10 / 9 / 15

Chief Administrative Officer's Signature

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| Date: 9/28/2015 | Offender: (Please Print) MC. Harris | ID#: A-25088 |
|---|---|---|

| Present Facility: Stateville C.C. | Facility where grievance issue occurred: Stateville C.C |
|---|---|

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Disciplinary Report: _____
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): safty; Grievances Violations

Date of Report _____ Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
**Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer,** only if EMERGENCY grievance.
**Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** The nurse who ignored my condition shows that I did not recieve medical care that is "equal to that available in the local community". See Level of Community Care.

**Relief Requested:** to EPA regulations ① That I be compensated for my pain and suffering and I recieve acknowledgement and a formal apology for the unecassary and deliberate infliction of pain cause by deplorable conditions

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Offender's Signature H Harris   ID# A:25088   Date 9,28,15

(Continue on reverse side if necessary)

**Counselor's Response (if applicable)**

Date Received: 9,30,15
- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name _____ Counselor's Signature _____ Date of Response _____

**EMERGENCY REVIEW**

Date Received: / /
Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner.

Chief Administrative Officer's Signature _____ Date _____

Distribution: Master File; Offender

Page 1

Printed on Recycled Paper

DOC 0046 (Rev. 3/2005)

ILLINOIS DEPARTMENT OF CORRECTIONS

## OFFENDER'S GRIEVANCE

| Date: 9/28/15 | Offender: (Please Print) MC Harris | ID#: A-25088 |
| --- | --- | --- |
| Present Facility: Stateville C.C. | Facility where grievance issue occurred: | Stateville C.C. |

**NATURE OF GRIEVANCE:**

| | | | |
| --- | --- | --- | --- |
| ☐ Personal Property | ☐ Mail Handling | ☐ Restoration of Good Time | ☐ Disability |
| ☑ Staff Conduct | ☐ Dietary | ☑ Medical Treatment | ☐ HIPAA |
| ☐ Transfer Denial by Facility | ☐ Transfer Denial by Transfer Coordinator | ☑ Other (specify): | 8th & 14th amend. violations |

☐ Disciplinary Report: _____     _____
                          Date of Report                          Facility where Issued

**Note:**    Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
  **Counselor,** unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
  **Grievance Officer,** only if the issue involves discipline at the present facility or issue not resolved by Counselor.
  **Chief Administrative Officer,** only if EMERGENCY grievance.
  **Administrative Review Board,** only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** While in the Stateville infirmary the Warden came and looked in my cell/room and then made a call on my phone he began to explain to some that, "Yes he's alive, I'm looking right at him," as if in disbelief I learned later that stateville for some reason believed I was dead and had placed my prison I.D. at the front gate in a box where dead inmates ID's are placed.

Ultimately I was sent back to population with an Asthma pump -- I have had some follow up, a chest x-ray and went back to St. Jo's where I was told it would be months before I see signs of recovery and

**Relief Requested:** ② that the water system here at Stateville be corrected and purified and I be provided with the required amount according to the FDA clean bottled water each day until such time statevilles water system is brought up

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

~~_____~~  S Harris     A-25088          9, 28, 15
         Offender's Signature                    ID#                              Date

                                  (Continue on reverse side if necessary)

---

| Counselor's Response (if applicable) | |
| --- | --- |

| Date Received: ____/____/____ | ☐ Send directly to Grievance Officer | ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |
| --- | --- | --- |

Response: _____
_____
_____
_____
_____

_____          _____          _____
Print Counselor's Name                    Counselor's Signature                    Date of Response

---

| EMERGENCY REVIEW | |
| --- | --- |

| Date Received: ____/____/____ | Is this determined to be of an emergency nature? | ☐ Yes; expedite emergency grievance ☐ No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |
| --- | --- | --- |

_____                    _____
      Chief Administrative Officer's Signature                                                  Date

Printed on Recycled Paper

ILLINOIS DEPARTMENT OF CORRECTIONS
## OFFENDER'S GRIEVANCE (Continued)

only then will it be determined if I'll make a full recovery, they also told me they are going to recommend I recieve a tetnis shot and pneumonia shot which I did.

According to an article by Dawn Rhodes entitled, "Stateville inmate diagnosed with Legionnaires' disease". The bacteria is commonly found in plumbing and water systems like Statevilles. The showers were quaranteened and were'nt re-open until about a week after my return to D-House. Copyright © 2015, Chicago Tribune.

Stateville has been aware for years that the water system was hazardous and continues to warn staff not to drink it but allows me with no warning to ingest the contaminated water. See 8/11/2015 order and staff only Legionnaires memo. The water problem dates all the way back to 12/3/2003 Wardens Bulletin No. 2003-118

On May 8, 2008 the Illinois Environmental Protection Agency ordered Stateville to respond to their findings that were in the attached "A" of the letter in 45 days. The findings were that the water was stagnet and would breed bacteria. That bacteria almost killed me, instead of correcting the water system it was ignored given rise to dozens up dozens of lawsuits and a class action.

The mold and overall filth in the shower area and cell house and stateville as a whole is another major factor in the breeding of desease and plague with the rodents roaches and ground hogs this entire situation could have been avoided had conditions been made sanitary.

Also Health care providers are in violation of there contract to have a doctor on the premises at all times or on call. No Doctor ever came and I had to wait to the next day until a Doctor decided to come to work and I almost died by the time they realized I need to be sent out. See Wexford Health Sources incorporated, "Level of Community Care" See also Eemergency Service -- the attending nurse should have made the call to send me out and then notified the medical Director. See Infirmary Care not a substitute for ICU. (PROVIDER HANDBOOK.)

WEXFORD medicine in corr. Prison Operations Policies and procedures Polcy No: p112
EMERGENCY SERVICES
Policy (24) hour emergency medical services, ect.
1. physician available 24 hours a day 7 days a week
violating this rule almost cost me my life.

**ILLINOIS DEPARTMENT OF CORRECTIONS**
**OFFENDER'S GRIEVANCE**

| Date: 9/28/15 | Offender: (Please Print) MC. Harris | | ID#: A-25088 |
|---|---|---|---|
| Present Facility: Stateville C.C. | | Facility where grievance issue occurred: Stateville C.C. | |

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [x] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [x] Medical Treatment
- [ ] Disability
- [ ] HIPAA
- [x] Other (specify): 8th & 14th amend. violations Hazardous & deplorable conditions of confinement

- [ ] Disciplinary Report: _____ / _____ / _____     _____
  Date of Report                                                        Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
   **Counselor**, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
   **Grievance Officer**, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
   **Chief Administrative Officer**, only if EMERGENCY grievance.
   **Administrative Review Board**, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** On or about the first week of August I began to feel very sick and fatigue, I immediately began to complain to the 7/3 shift nurse who passes out the meds first thing in the morning.

The nurse(s) refused to assist me in any way, and stated plainly there was nothing "THey" medically could do for me. While everyday my condition got worse and it became harder and harder for me to breath until finally on the morning of 8/15/2015 I got out of bed to try and use the toilet and I collapsed urinating and defecating on myself.

**Relief Requested:** ① Per 504.830 Grievance Procedures (d) I recieve the decision in writing within 2 months after you recieve this grievance ② And that per 504.850 Appeals I recieve a response from Springfield within 6 months →

- [ ] Check only if this is an **EMERGENCY** grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

| Harris | A-25088 | 9/28/15 |
|---|---|---|
| Offender's Signature | ID# | Date |

**(Continue on reverse side if necessary)**

---

| **Counselor's Response (if applicable)** | |
|---|---|
| Date Received: _____ / _____ / _____   [ ] Send directly to Grievance Officer | [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277 |

Response: _____

_____

_____

_____

_____

| _____ | _____ | _____ |
|---|---|---|
| Print Counselor's Name | Counselor's Signature | Date of Response |

---

| **EMERGENCY REVIEW** | |
|---|---|
| Date Received: _____ / _____ / _____   Is this determined to be of an emergency nature? | [ ] Yes; expedite emergency grievance [ ] No; an emergency is not substantiated. Offender should submit this grievance in the normal manner. |

_____     _____
Chief Administrative Officer's Signature                              Date

Distribution: Master File; Offender                **Page 1**                DOC 0046 (Rev. 3/2005)

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER's GRIEVANCE** (Continued)

After coming to, my cellmate asked me was I okay and I remember him helping me to sit on the toilet and clean myself up, and then I passed out again. at that point I awoke to my cell-mate and the inmates in the cell next to me calling for the c/o and the med-tech.

C/o Norman came promptly to the cell and immediately notified his superior who called healthcare. No med tech ever came, but I was told to put on my blues I was going to health care. I barely made it to the end of the gallery before almost collapsing again somehow I managed to make it to the flag and C/o Boton recognized I was in bad shape and escorted me in a wheel chair, to the H.C.U.

I got to the healthcare Unit and was placed in a room, I was not examined because no physician was at Stateville, it was until the next day that I was finally seen by someone and I was immediately rushed to the outside hospital. I felt like I was going to die, and according to the nurse at the outside hospital I looked like I was going to die.

The nurse at St. Jo's asked what was wrong with me, I didn't know is all I could tell her, but I feel real bad, So She hooked me up to a bunch of IV's and took alot of blood from me. About a half hour later I was being rushed to U.I.C. in an ambulance.

When I got to U.I.C. I was placed in the Intensive Care Unit. I was hooked up to more IV's and more blood was taken and I was forced to slob in a cup.

A couple of days later I woke up and several doctors were all standing around my hospital bed at that time for the very first time I was told I had Legionaires Disease, and had suffered a collapsed lung and was in a very bad stage of pneumonia and that I was very lucky to be alive -- I had yet to learn Legionaires had taken the lives of several senior citizens in a Quincy old folks home. The Doctor told me if they (Stateville) had waited one more day I might not have had a fighting chance.

I stayed in the I.C.U. for a few days and was moved to another cell and stayed there for a few more day constantly having my vitals checked; blood drawn and hooked up to IV's. I was discharged from the UIC on 8/21/2015.

I was taken back to Stateville where I was housed in the infirmary until 9/16/2015. I was hooked to a oxygen machine and recieved breathing treatments

# Stateville inmate diagnosed with Legionnaires' disease

By Dawn Rhodes

AUGUST 12, 2015, 6:56 PM

An inmate at Stateville Correctional Center in Joliet has been diagnosed with Legionnaires' disease, according to the Illinois Department of Corrections.

The inmate is being treated at an outside hospital, IDOC spokeswoman Nicole Wilson said.

No other prisoners have displayed symptoms and the inmate's cellmate tested negative, Wilson said.

No other details about the inmate or when that person was diagnosed were immediately available.

Legionnaires' is caused by a bacteria commonly found in warm water, like in hot tubs, cooling towers, hot water tanks, fountains and large plumbing systems, according to the Centers for Disease Control and Prevention.

People contract the illness by breathing in a mist or airborne water droplets carrying the bacteria, according to the CDC. It is not spread from person to person.

People who come down with the disease can have a cough, shortness of breath, fever, achiness and headaches, according to the CDC.

Many who contract the disease never show symptoms, but those who do usually become ill around two to 10 days after exposure to the bacteria.

Legionnaires' usually is treated with antibiotics, according to the CDC. IDOC is attempting to identify the source of the disease and staff have begun sanitizing certain areas of the facility, Wilson said.

Copyright © 2015, Chicago Tribune

EXH-D

# WATER TESTING IN PROGRESS

# PLEASE DO NOT USE WATER FROM THIS SITE

# Date: 8/11/2015

Sign will be removed when testing completed

EXH-9

EXH-E

## Stateville Correctional Center

# WARDEN'S BULLETIN #2015-65

## August 11, 2015

TO:    ALL STAFF

RE:    LEGIONELLOSIS DISEASE



### ILLINOIS DEPARTMENT OF PUBLIC HEALTH
### HEALTH BEAT

## LEGIONELLOSIS

**What is legionellosis?**

Legionellosis is a bacterial disease caused by *Legionella pneumophilia*. The disease, which may occur in outbreaks or as single cases, can cause mild respiratory illness or pneumonia. The most common form of the disease is known as "Legionnaires' disease."

**How common is legionellosis?**

It is estimated that about 8,000 to 18,000 people develop legionellosis in the United States each year. An additional unknown number are infected with the *Legionella* bacterium but have mild symptoms or no illness at all.

In Illinois, between 25 and 50 cases are reported each year.

**Why is it called legionellosis?**

An outbreak of this disease occurred in Philadelphia in 1976, largely among people attending an American Legion convention; this led to the name "Legionnaires' disease." Subsequently, the bacterium causing the illness was named *Legionella* and the name of the illness was changed to legionellosis.

**Is this a new disease?**

1  20

*Exh 9*

No. While the bacterium was only identified following the 1976 convention, earlier cases have been confirmed as far back as 1947 and cases probably occurred before that date.

**Where are *Legionella* found?**

*Legionella* are widely distributed in our environment. They have been found in creeks and ponds, hot and cold water taps (primarily hot water taps), hot water tanks, water in cooling towers and evaporative condensers, and whirlpool spas.

Most people contract the disease by inhaling mist from a water source contaminated with the bacteria. In some cases, the disease may be transmitted by other ways, such as aspirating contaminated water. All studies to date have shown that person-to-person spread does not occur. Outbreaks occur following the exposure of many individuals to a common source of the bacteria in the environment. When a single case occurs, it is extremely difficult to pinpoint a source. Environmental testing is recommended only when multiple cases have the same potential exposure.

**How severe is the illness?**

Legionellosis can be a mild respiratory illness or it can be severe enough to cause death. Studies have shown that about 5 percent to 30 percent of known cases have been fatal. From 1 percent to 20 percent of healthy adults have antibodies showing previous exposure to the organism, but only a small percentage have a history of previous pneumonia. This suggests that many cases of Legionnaires' disease go undiagnosed.

**Who gets legionellosis?**

People of any age may get Legionnaires' disease, but the disease most often affects middle-aged and older persons, particularly those who smoke heavily. People with underlying illness, such as cancer, kidney disease, diabetes, AIDS, chronic lung disease or heart failure, or who have had an organ transplant also are at higher risk. Individuals who take corticosteroids (e.g., prednisone, azathioprine or cyclosporine) are also at higher risk.

**What are the usual symptoms of legionellosis?**

The most common symptoms of legionellosis are fever (102 degrees F - 105 degrees F), chills, and a cough (which may be dry or productive). Some patients also have muscle aches, headaches, tiredness, loss of appetite and, occasionally, diarrhea. Chest X-rays usually confirm pneumonia. Legionnaires' disease cannot be distinguished from other causes of pneumonia based on symptoms alone. Special testing is required to establish this diagnosis.

Ex49

## How soon do symptoms occur?

The period between exposure and onset of illness for Legionnaires' disease is two to 10 days, but most often five to six days.

## How is legionellosis diagnosed?

Legionellosis usually is diagnosed by one of four methods. The organism can be seen under a microscope in sputum or tissue using special stains. The bacteria also may be cultured from sputum or tissue; this usually takes two to five days. Passing a small lighted tube into the lungs (a procedure called bronchoscopy) or sometimes even an operation may be required to obtain a specimen for staining or culturing. The bacteria also can be detected in the urine. Comparison of blood tests obtained during the illness and several weeks later may be needed to make the diagnosis when other methods are inconclusive or are negative.

## What is the treatment for legionellosis?

Antibiotics appear to be effective in treating the disease; erythromycin is currently recommended as the drug of choice. Other drugs are available for patients unable to tolerate erythromycin.

Last updated April 25, 2007



idph online home
health fact sheets

Illinois Department of Public Health
535 West Jefferson Street
Springfield, Illinois 62761
Phone 217-782-4977
Fax 217-782-3987
TTY 800-547-0466
Questions or Comments

**Nicholas Lamb**
**A/W of Operations**

EX'F   EXH-F   EXH - E (a)

# Illinois
## Department of
# Corrections

Pat Quinn
Governor

S. A. Godinez
Director

Stateville Correctional Center / Rt. 53 / P.O. Box 112 / Joliet, IL 60434 / Telephone: (815) 727 -3607 / TDD: (300) 526-0844

## MEMORANDUM

DATE:     July 21, 2014

TO:

FROM:     V.P. Calloway
          Assistant Warden of Programs

SUBJECT:  <u>LIBRARY</u>

This is in response to your letter regarding the Library not being open. Please be advised that the general library has been open to offenders. Most of the books in the library have some form of mold on them due to the leaking roof however there are two carts of books available for general reading purposes that do not have mold of them.

I trust this addresses your concerns.

VPC: dv

23



PROVIDER HANDBOOK

necessity. Many inmates demand to see a specialist for minor events, or just to get a second opinion. If you, as responsible physician, believe specialty services are indicated and identify a medical need, the case must be discussed in collegial review. Please review the utilization management policies and procedures for all offsite care.

### Onsite Specialty Care

At some units, specialty physicians come on site and hold scheduled clinics. This is frequently the case with orthopedics, general surgery and optometry. This allows more inmates to be seen in a secure setting, and decreases the transportation demands on the department. The specialty physician also becomes more familiar with the inmates and the requirement of the correctional setting. These physicians are "consultants" and require supervision by the facility medical director for appropriateness of recommendations.

### Offsite Specialty Care

When specialists are not available for "onsite" clinics, inmates may be scheduled to be seen in the specialist's office, in the local hospital emergency department or other ambulatory care facility. All such referrals must be arranged through the corrections department, and pre-approved through Wexford's utilization management/collegial review process. Every effort must be made to use contracted providers.

## Hospital

At times, specialty care requires hospitalization. This may be requested on either a routine or emergency basis. When an emergency admission occurs, Wexford must be notified as soon as practical. Scheduled admissions should be requested through routine utilization management/collegial review. Such requests should clearly identify the medical necessity for the admission - beyond "the inmate agrees to (or wants) the surgery."

The recommendation for a procedure (or service) by a specialist should be given significant weight when deciding to provide that service; however, the unit physician must agree that such a procedure is indicated and necessary. All inmates are the patients of the medical director, NOT the specialist. Using a specialist does not remove the unit physician from the primary responsibility for care. The specialist does not (or may not) understand the special requirements of the correctional setting, and you must make treatment decisions within that context. In addition, the treatment or repair may not be the responsibility of the Department of Corrections. That is an interpretation you must make.

## Hospital Care

As reflected above, hospital care is a necessary part of our responsibility. This is done in many ways; however, most of the time, this is done by referral. Again, referral for hospitalization does not remove you from responsibility for the patient. Speak to the consulting physician to whom you are referring the patient. Learn of his (her) treatment plans and jointly create the discharge plans. Follow up on the status of the patient, and inform the physician of the capabilities of the unit to provide convalescence or other care.

Make arrangements to get an immediate discharge summary when the patient is released.

## Dialysis

Some units have dialysis units where inmates may be dialyzed when the management and control of their end stage renal disease has exceeded the ability of the unit staff. Acute dialysis for toxic overdose or acute renal failure is usually accomplished through hospital referral.

EXHIBIT G

 **Wexford Health**
SOURCES INCORPORATED

PROVIDER HANDBOOK

### "Level of Community Care"

Both by contract and by decree of the federal courts, corrections departments must provide inmates' medical care that is "equal to that available in the local community." Generally this means "usual and customary" medical service. Although a program of comprehensive medical care is required, not every diagnosis mandates treatment, nor is repair done on every existing condition. The medical staff should identify medical conditions on entry, or as early as possible, and design a program of individual care that seeks to maintain inmate health during incarceration. Illness or injury occurring during, or aggravated by incarceration should be promptly and appropriately attended.

These objectives can be met in many ways, including proper classification, inmate education, alterative of work and recreational assignments, frequent observation and examination, adjustments of medication and/or diet, and adjustments of a multitude of other variables. Consideration should be given to any alternative therapy that protects the patient and is allowable in the correctional setting. *Please discuss with the regional medical director and/or corporate medical director any unusual alternative therapy being considered before it is started.*

Inmate health problems are considered somewhat like "worker's compensation" cases. If a condition occurs in conjunction with, or is aggravated by incarceration, it is the responsibility of the Department of Corrections (thus the medical contractor) to treat or correct it. Many inmates, however, enter with pre-existing problems that require significant care. Random examples include diabetes mellitus, hypertension, cancer, chronic renal problems, cardiac disease, asthma, seizures, paralytic conditions, and many other significant debilitating conditions. Conditions that are pre-existing, chronic, and stable require monitoring only.

Longstanding problems, e.g., arthritis, old knee and ankle injuries, recurrent low back ache, flat feet, childhood eye problems resulting in amblyopia, presbycusis, hammer toes, "trigger fingers," persistent acne, tinea versicolor, inguinal hernias of long duration without complication, uncomplicated ventral hernias, uncomplicated umbilical hernias, and a multitude of other such conditions may receive minimal, but reasonable support or observation.

Many variables must be considered when deciding a course of treatment. These include, but are not limited to the following:

> When (how long ago) did the problem begin?
> The chronicity of the problem
> Whether the problem initiated in the Department of Corrections, or prior to incarceration
> What is the problem?
> How long is the inmate's sentence? When will he (she) be released?
> Will the treatment "make a difference?"
> Will it improve the inmate's function?
> Will the treatment make the care of the inmate easier for the medical or correctional staff?
> What is the simplest, most basic, and safest means of managing this problem?

24



physician, or in his (her) absence, sent to the local hospital emergency room.

Physician Call is scheduled daily for the general population, and is held at least weekly in "lock down" areas such as administrative segregation or protective custody. This time is used by the physician for medical evaluations, follow-up treatments, clarification of symptom complaints, diagnostic study, etc. Physician Call in "Lock Down" should be limited to screening and the discovery of problems needing further attention. Identified problems should be brought to the health care unit later for proper evaluation and treatment.

Pill Call is scheduled delivery of prescribed medication, and may occur either inside the health care unit, or at the assigned cell blocks. This is managed differently at different units. Medication is usually given by nurses or corrections medical technicians (CMT's).

## Emergency Service

Inmates have access to emergency service any time there is no scheduled service available. Emergency service can be provided onsite by whatever level of provider able to meet the level of care necessary. If the unit has sufficient equipment and personnel skill to meet the patient's problem, it should be managed there. If the facility, equipment, or skill level of the onsite personnel is inadequate, the patient may be transferred to the nearest hospital emergency department.

If no staff physician is on site and the situation is life-threatening, the attending nurse may make the decision to transfer the patient. In such an event, the unit medical director must be notified at the earliest possible time. Wexford must authorize payment for this service, so an Emergency Referral Sheet should be faxed to the Wexford Pittsburgh office as soon as reasonably possible.

## Infirmary Care

The inpatient unit is available to provide limited medical and nursing services for patients with health care problems in an inpatient setting. Inpatient services may include medical care, isolation, observation, first aid, nursing care and post-operative care. Patients may also be assigned to the inpatient unit for sheltered housing. In-patient care is not used as a substitute to hospital level care (ICU, medical/surgical acute care), or a licensed nursing care facility. It is generally recommended that all patients discharged from acute inpatient facilities be placed in the infirmary for observation, unless such a patient is deemed stable for the general population. Clinical issues are the responsibility of the Site Medical Director or designee and operational issues are the responsibility of the Health Services Administrator and the Director of Nursing.

## Chronic Care

Services are provided on site to monitor the status of inmates with identified chronic illness conditions. Chronic Clinics for patients with the following are normally required: cardiac-hypertension, diabetes, asthma and seizures. Any other such clinic could be established at your discretion. These clinics are generally defined by a mandated protocol. Any additional clinic should have a similar protocol written and approved prior to initiation of the clinic.

Chronic Disease Clinics are normally conducted every 3 to 4 months, and provide the basis for preventive and prospective care of the patient's problem.

## Specialty Care

It is impractical to have specialists in every unit, so arrangements are made to support the staff physician services with specialty consultation. Actually, you may seek consultation for an inmate in any area you feel is medically indicated for an inmate. The key issue is medical

**Wexford Health**
SOURCES INCORPORATED

PROVIDER HANDBOOK

swelling. For example, to prolong a "sprained" ankle or "edema" of the distal leg or arm. If you are presented with a confusing symptom set that isn't supported by history, testing or general physical findings, suspect an iatrogenic etiology.

One of the constant demands in almost any correctional unit is for "soft" shoes. Shoes are rarely a medical issue. Once inmates know you will authorize soft shoes, their demands quickly become unmanageable. On occasion, there is a clear medical indication or a situation with a medical basis for using soft shoes. If you are convinced that is the case, prescribe them, but justify the decision.

## ADMINISTRATIVE SERVICES

### Policies and Procedures

The basic policies guiding the correctional operations are found in the department's administrative directives where you are working. It is vital that you read, know and develop the medical operation within the guidelines of these directives. There will be a section that addresses the general operational policies of the medical unit. Specific medical operations in your assigned unit are described in the institutional directives of each individual unit.

Wexford provides a set of medical policies and procedures as well as operational policies from which the medical staff can develop their own. These are prepared with cross-references between the various standards to facilitate compliance.

### Referrals

As part of your medical support system, you will be requesting referrals to specialists, sub-specialists, emergency departments, hospitals, ambulatory facilities and other providers. Each referral requires a collegial review along with a utilization management form to be completed and submitted for an authorization number. That number authorizes Wexford to reimburse for the service.

If you decide a referral is indicated, complete the referral form with brief but pertinent information about the case and what is being requested. The following discussions will give you a sense of the considerations for making decisions about referrals. The initial portion deals with a most difficult decision area - appropriate care for pre-existing conditions.

## PRE-EXISTING MEDICAL CONDITIONS

### The Basis for Care

1. Upon incarceration, the inmate becomes a ward of the state. The DOC becomes the *"guardian"* of each inmate, and has *"parental"* responsibility.

2. Incarceration limits the "medical alternatives" of the inmate, thus incurring a higher demand level from the medical service.

3. The DOC/county (and medical contractor) is prohibited from practicing **"deliberate indifference to serious medical needs"** in the course of medical service. We are obligated to provide medically necessary care consistent with community standards.

4. By means of contract definition (and the support of federal court decisions) medical care usually is interpreted as "comprehensive medical services equal to those available in the local community." It is understood that *"local community"* may be more liberally interpreted as the current state of the art as generally practiced across the country.

5. Contracting for medical service does not relieve the state of their responsibility as



are important, and 6) all pertinent laboratory, radiographic, pathologic, or other studies.

This report is both an informational and a legal document that becomes a part of the permanent record, and part of our medical review. Please treat it as such. We expect a high degree of candor in the treatment of the document. There is no place for unfounded incriminations or speculations. This must be a factual document with your best effort at reasonable analysis and detail. The degree of detail is left to your judgment; be thorough, but concise. Above all, include ONLY what is supported by existing, documented and preserved evidence, and validated information sources.

## High-Risk Population

The population of any Correctional Unit has "more" of almost any pathologic condition you wish to consider. The lifestyles, personalities, socio-economic pathology and circumstances of illegal trafficking extracts a huge physiologic price tag. As responsible professionals, we are here to maintain the best level of health possible for as long as is reasonable. Personal judgments regarding the basis for the problem have little place in the treatment of these problems.

Patients with AIDS, end-stage renal disease, failing cardio-vascular support, uncontrolled diabetes mellitus, and many other terminal problems that may generate from poor lifestyles should find support and reasonable comfort in the health care staff. These patients often pose the greatest challenges to the healthcare staff. Nevertheless, we must extend our care and attention FAR beyond the usual limits of private practice. These patients have no place to go -- YOU may be their final provider. Regardless of what they have done, they deserve your best care. Judgment of their prior acts should be left to those capable of overall judgment.

## Experimental Care Services

- Inmates may not participate in an experimental study without the specific written approval of the corporate medical director. Further approval will be required by the agency medical director or the state Department of Corrections. Not by inmate

## Transportation

Transport of inmates for outside medical service is usually the task of the Department of Corrections. As contractor, we are usually responsible for emergency transportation. However, these issues are specifically addressed in the contract.

## Cost Considerations

A criticism frequently directed toward private managed care programs like Wexford is that services are withheld to improve profits. Similar criticism has been directed at the medical industry in general, implying that cost - money - should never be a consideration in regards to providing medical care. Cost has always been a consideration in treatment, and with progressive government "Health Care Reform" will become a far greater factor than it has ever been under the "control of the health profession."

Consideration in deciding treatment is given to whether or not the Department of Corrections has the responsibility to provide a treatment. The mere existence of a condition DOES NOT CONSTITUTE A RESPONSIBILITY for repair!

When considering alternative treatment approaches, cost becomes a consideration. Even then, it is not THE determinant, but only ONE of several possible variables considered. Cost, per se, usually becomes the last variable considered, belying its importance.

Meanwhile, the role of the medical staff is to: 1) provide medical care to individual patients,



and 2) seek the best quality we can afford and spread our health care budget to effectively cover as many services as possible. Cost has been and must continue to be a consideration. The "cost of service" remains an important factor to be shouldered by each health care professional. Being fiscally responsible builds a broader range of treatment alternatives.

# WEXFORD

MEDICINE IN CORRECTIONS

PRISON OPERATIONS
POLICIES AND PROCEDURES

| Reference:<br>National Commission on Correctional Care: P-A-01<br>American Correctional Association: 4-4344, 4-4345 | Policy Number<br>P-101 |
|---|---|
| Date Adopted: 10/03  Date Reviewed: 03/05; 10/06 | |
| Approved By:  Dr. Thomas Lundquist, Chief Medical Officer | Page 1 of 1 |

## ACCESS TO CARE

**POLICY:**

All inmates will have unimpeded access to all health care services at the facility.

**PROCESS:**

*Not true* ① The responsible health authority for the facility will ensure the timely and efficient response to all inmates' health care needs.

*Not true* ② The responsible health authority for the facility will ensure that unreasonable barriers to health services are avoided or eliminated.

*Not true* ③ Sick call will be conducted during reasonable times to ensure inmates have access to services.

IV. If there is an inmate co-pay policy, the fees will be reasonable and no inmate will be denied access based on the inmate's inability to pay the fees.

Plaintiff's Exhibit 19-6

1
WEX240

# WEXFORD
MEDICINE IN CORRECTIONS

PRISON OPERATIONS
POLICIES AND PROCEDURES

| Reference:<br>National Commission on Correctional Care: P-E-08<br>American Correctional Association: 4-4388, 4-4389 | Policy Number<br>P-112 |
|---|---|
| Date Adopted: 10/03  Date Reviewed: 03/05; 10/06 | |
| Approved By:  Dr. Thomas Lundquist, Chief Medical Officer | Page 1 of 1 |

## EMERGENCY SERVICES

**POLICY:**

    Wexford will provide for twenty-four (24) hour emergency medical, dental, and mental health services for inmates.

**PROCESS:**

I.    A physician will be available for consultation twenty-four (24) hours per day, seven (7) days a week.

II.    Health care staff will be oriented to Emergency Services at the time of their initial orientation.

III.    The Health Services Administrator will ensure that a list of names and phone numbers of persons to be called in the event of an emergency is available to health care staff in the health care unit at all times.

IV.    In the event of an emergency, the inmate will be stabilized and then transferred to an appropriate health care unit if necessary.

    A.  Ambulances are accessed through the appropriate ambulance company or by calling 911.

    B.  Whenever possible, the physician will be notified prior to transporting the patient to the hospital.  However, in a life-threatening emergency, the patient will be sent to the hospital in the most expedient manner and the physician will be notified later.

    C.  Health care staff will follow the facility's security protocol for transporting patients for emergency care.

V.    The Facility Administrator will be informed of any medical emergency.

VI.    Emergency equipment and supplies will be regularly maintained in accordance with the manufacturer's guidelines and will be accessible to health-care staff at all times.

VII.    The Medical Director will provide appropriate health care staff with annual training on emergency equipment.

Plaintiff's Exhibit 19-13

16
WEX247

31

# WEXFORD

**MEDICINE IN CORRECTIONS**

**PRISON OPERATIONS
POLICIES AND PROCEDURES**

| EMERGENCY SERVICES | Policy Number P-112 |
|---|---|
| | Page 2 of 2 |

VIII. Emergency services will be monitored via the Continuous Quality Improvement Program and corrective action plans will be developed and implemented as necessary.

Plaintiff's Exhibit 19-14
17
WEX248

3.2

# WEXFORD
MEDICINE IN CORRECTIONS

PRISON OPERATIONS
POLICIES AND PROCEDURES

| Reference:<br>National Commission on Correctional Care: P-G-03<br>American Correctional Association: 4-4352 | Policy Number<br>P-113 |
|---|---|
| Date Adopted: 10/03  Date Reviewed: 03/05; 10/06 | |
| Approved By:  Dr. Thomas Lundquist, Chief Medical Officer | Page 1 of 2 |

## INFIRMARY CARE

**POLICY:**

Wexford will ensure that, in a facility with an infirmary, skilled nursing care will be provided for patients who are not in need of acute hospitalization or placement in a licensed nursing care facility, but who are in need of twenty-four (24) hour management and supervision of medical care.

**PROCESS:**

I. A physician will be on call twenty-four (24) hours per day with daily supervision by a registered nurse and sufficient numbers and appropriate levels of health care support staff.  The number of patients in the infirmary, severity of their illnesses, and level of care required for each patient will determine staff levels or as may be required by contract.

II. An Infirmary Care manual will be developed and maintained that is consistent with the state's nurse practice act and licensing requirements.

III. All admission and discharge orders will be signed or co-signed by the physician.

IV. Patients will be in sight or hearing of health care staff at all times either through windows or a call light/buzzer system which is monitored by the correctional staff.

V. The scope of care provided will not include the level of care and/or observation requiring acute hospital admission or licensed nursing care facility but may include any of the following:

A. Intermittent skilled nursing care procedures
B. Close observation of potentially serious medical conditions
C. Medical isolation for a communicable disease or for a condition that warrants protective isolation
D. Convalescent care including basic nursing care required for activities of daily living (i.e., quadriplegics, Alzheimer's, post-op convalescent care)
E. Close medical and/or security monitoring due to appliances, prosthetics, or other medically necessary equipment

VI. The behavioral health staff will supervise patients admitted to the infirmary for mental health reasons and may be housed separately from other patients, depending on the facility requirements.

Plaintiff's Exhibit 19-26
18

# WEXFORD

**MEDICINE IN CORRECTIONS**

PRISON OPERATIONS
POLICIES AND PROCEDURES

| INFIRMARY CARE | Policy Number P-113 |
|---|---|
| | Page 2 of 2 |

VII. A complete inpatient health record will be maintained and will contain, at a minimum:

    A. Admitting notes
    B. Treatment plan (including medication, diet, and activity restrictions)
    C. Diagnostic testing
    D. Frequency of vital sign monitoring
    E. Medication administration record
    F. Discharge plan

VIII. Upon discharge from the infirmary, the infirmary medical record will become part of the inmate's medical record.

Plaintiff's Exhibit 19-27
19
WEX281

34

EXHIBIT B

Wexford Rap Sheet

Illinois Department of Corrections     EX.δ.6

Jul 11, 2014 wbez.org

On July 28, 2012, Elawndoe Shannon put in a request for sick call at the prison where he was housed in Lawrence, Illinois. Two days later, he died. The day after his death a nurse in the health care unit finally got his request slip for medical care. "That means somebody took it and just said, 'Oh it don't matter, ain't nothing wrong with him.' That's crazy!" said his sister Jackie Shannon in a recent interview on the front porch of her house on Chicago's South Side. "Everybody's entitled to see a doctor. I don't care, you could live in a hole somewhere. If you come out of that hole and you're sick, you should be able to see a doctor. How many other ones in there that need to see the doctor and need seeing a doctor?" she said. It's not unusual for Illinois inmates to complain that they have trouble seeing doctors. In another story, WBEZ reported on Anthony Rencher who went to the prison health care unit in the middle of the night where he was observed in the waiting room for an hour before he returned to his cell where he died. And then there's the case of Daniel Nevarez. **Letter from the grave:** Daniel's brother Alonzo Nevarez sits on the front stoop of his dad's bungalow near Midway Airport and reads through a letter his brother Danny wrote from prison. "We got the letter after Danny passed, and it was, it's him talking from the grave actually," said Nevarez. It's in Spanish and Alonzo translates while he reads. "The reason for this card, to beg you to help him, he's sick, and the people from this facility, no me quieren, they don't want to help me. These people are not taking me serious. I need help." According to medical records, in March of 2010 Nevarez complained to a prison health care worker of pain in his knee. The prison took an X-ray but found nothing. The doctor prescribed some drugs and told Nevarez to exercise as much as possible. A year later Nevarez was still complaining about his knee. He was prescribed Motrin and referred to a doctor. The next two appointments with the prison doctor were cancelled, one because of understaffing and another one because there was no security escort. "He called when he was in prison complaining that they were ignoring him. They wouldn't let him see the doctor," said Nevarez. The medical records also show that on several occasions Nevarez refused to see health care workers. In one instance he's quoted as refusing to see the prison doctor because he wants to be immediately taken for surgery on his knee. On another occasion he refuses to pay the $2.00 co-pay and is therefore denied care. **Cancer diagnosis:** When the mass on his knee was diagnosed as cancer 15 months after his first complaints, the tumor was hard to miss. It was 5 centimeters by 5 centimeters by 3 centimeters. Daniel's father Salvador Nevarez said his son was complaining that the prison wasn't giving him health care, so the family had a lawyer contact the prison. Nevarez went to an outside hospital where the tumor was removed. He also went for 33 radiation treatments. A year after his treatments on December 13, 2012, Nevarez once again sought medical care. According to records it appears to have fainted and gotten a cut above his eye when he fell. He told doctors his head hurt and he couldn't remember things. A doctor at the facility seems to have decided Nevarez was lying in an attempt to get drugs. The way it's recorded in the medical record is: "appears to be med seeking." Nevarez was sent back to his cell. He fell into a coma. A CT scan of his head was taken and it showed he had two large, dense brain tumors and swelling in his brain. He died that day at the age of 31. The autopsy states, "Given the lack of follow up care and systemic chemotherapy this patient, in combination with with the poor prognosis in general for such a tumor, it is not surprising that he developed widespread metastases a year after diagnosis." In the death review the department handed over to WBEZ, where it asks, 'Was an earlier intervention possible?' the answer is redacted. On the non-redacted version given to the family, it says the cancer diagnosis could have been made sooner, though it says it was, "probably too late for significant intervention." **Seeing a doctor 'can take months':** "It's a symptom of an overloaded system that it takes forever to get over to a doctor," said Alan Mills, an attorney specializing in prison litigation. "And then once you're there you don't see the doctor right away, you go through two or three screening processes before you finally get to see a doctor. So that can take months." "There are red flags all over the place," said Mills. "But without the details, you have to get beyond just saying, 'well this person died too soon.' You don't know that unless a doctor looks at the medical records and says, 'no this test was done or this test wasn't done, this is what the follow should have been and it wasn't.'" That work is now being done by a doctor appointed by a federal judge as part of the class action suit Mills filed over health care. The State of Illinois pays a company called Wexford Health Sources more than $100 million a year to provide health care in the prisons. Wexford did not return repeated calls for comment over the last two weeks. That's just the most recent refusal—WBEZ has had an ongoing request for an interview with the company for almost two years. Attorney Alan Mills has studied the contract between Wexford and the state. "Wexford gets paid the same amount whether they provide a lot of care or a little care, so therefore, every time they provide care their stockholders lose money. So that is a fine model, but you have to have some control to make sure that they're actually providing the care that you're contracted to giving them. Nobody in the state of Illinois regularly audits the Wexford contract, either financially, or more importantly, a health audit to see what the outcomes are that we're getting," said Mills. **IDOC won't discuss Mills:** Illinois Department of Corrections spokesman Tom Shaer won't discuss issues raised by Mills. "I'm not going to discuss anything that Alan Mills says because Alan Mills has been proven to state things that are false, so I'm going to respectfully decline to include any information coming from Alan Mills in this interview. Anybody else you want to talk about, fine, not him," said Shaer. The medical director who oversees more than $100 million Illinois pays Wexford for medical care refused to speak to WBEZ.

WBEZ asked Gov. Pat Quinn's office about the medical director's refusal to discuss medical care. After an initial conversation the governor's office simply ignored follow-up calls and emails from WBEZ. **Illinois prisons have low death rates compared to other prisons:** Shaer says focussing on just a few cases does not give an accurate picture of health care in the department. He points to Bureau of Justice statistics showing Illinois' prison system has one of the lowest death rates in the country compared to other prison systems. "We have pretty high standards here. We do the best we can within our ability to monitor that and if we felt that our ability wasn't adequate, we would find a way to address that," said Shaer. **Independent experts should provide some answers soon:** "I see enough things that tell me there are really some warning signs here. I mean there are problems," said State Rep. Greg Harris. Harris held committee hearings last year to dig into allegations of poor care. "You know in the testimony, in the contacts from individual families, in the lawsuits that have been settled and paid by the state for deaths that should have been preventable, I know there are things that we should have done that we did not do and that there are probably things that we ought to be doing better now," said Harris. As a result of the hearings, Harris concluded that no one in Illinois is paying close attention to the $100 million the state pays Wexford every year. Harris brought in the National Commission on Correctional Health Care to audit health care, both the finances, and the health outcomes. He says independent experts who know how to evaluate health care in a prison setting are looking at the system and should provide some answers soon. That audit is in addition to a federal court monitor who is also evaluating Illinois' prison health care system in response to complaints.


Jan 20, 2014 couriernews.suntimes.com
A former Kane County Jail inmate is suing Kane County Sheriff Pat Perez, alleging that he was denied depression and anxiety medication during his incarceration, which led to a suicide attempt. Randy Brattin, 33, of Elburn, is seeking more than $50,000 in damages, and has named Perez, and Wexford Health Sources, Inc. in the suit he filed earlier this month. Wexford contracts with the jail to provide medical services to inmates, according to court records. Brattin was taken into custody on Nov. 30, 2012, on his fourth drunken driving charge, fleeing/eluding deputies and several other charges. During his incarceration, Brattin said he was denied his prescribed and required medication for the treatment of anxiety, depression and seizures. The suit claims that jail policy is to inventory medication brought in by an inmate, and then to have the Sheriff's Department's own medical staff supply the same or equivalent medications to the inmate. Brattin said in the lawsuit that never happened. Instead, he said, doctors never regularly examined him, or contacted his primary care physician or family regarding his medical care. In the suit, Brattin said he notified staff at the jail that he was supposed to be taking the medication. Brattin "never received the medication he requested" the suit alleges. Because of this, Brattin attempted to take his own life by cutting his wrists on Dec. 6, 2012, the lawsuit states. As a result of being denied his medication, Brattin "suffered severe depression, and/or panic attack ... and attempted to commit suicide," the suit states. Perez would not comment on the pending allegation. Brattin's case management conference is scheduled for Feb. 20 in Kane County.


March 26, 2013 wbez.org
When William Jessup got to Vandalia prison he went to the dentist. Jessup says the dentist told him he had two cavities and offered to pull them. Wait..huh? "No, you're gonna pull my teeth out. Any qualified dentist will tell you it's always best to keep your teeth," said Jessup in a recent interview at the Vandalia prison in southern Illinois. "I'm assuming it still applies here but obviously it don't, because I still have the two cavities." When Anthony Rivera first got to Vandalia prison he caught some sort of foot fungus. His feet started smelling bad and he started getting sores, so he went to the doctor there and the doctor gave him foot cream but it was expired. When he told the doctor it was expired, he says the doctor told him that those were just numbers on the container, not an expiration date. "I'm like, what are you talking about," said Rivera. "It says 9/17/2010. How that's gonna be just regular numbers? He's like, well you don't want it then leave, so I took it just to take it. I put it on my feet but it got worse." Rivera says the sores on his feet got so large and painful that eventually he couldn't walk. "They gave me some kind of a shot and it relieved it a little bit but it took a nice three months," said Rivera. Illinois taxpayers are paying Wexford Health Sources, a private health-care company, moe than $1.3 billion over ten years to provide care for inmates in prisons. But most of the inmates WBEZ has talked to say, unless it's an emergency, they're not getting the care taxpayers have already paid for. And the Illinois Department of Corrections doesn't seem to have any mechanism to ensure that taxpayers aren't being fleeced in the health care deal. One more case. Jeff Elders. (Elders and Jessup were both featured in our story Tuesday about Illinois spending big money on people convicted of relatively minor crimes. Jessup got a four-year sentence for having a stolen license plate sticker. Elders got a couple years for trying to steal $111 from J.C. Penney.) Elders has a hard growth on the palm of his right hand. He holds it up for me to see and pokes at the hard part. "It's all along the tendon," said Elders. It's climbing probably three inches up my hand on my tendon. That's all hard, real hard and right here there's a big ol' thing. It's pulling that finger in. They say it's a calcium build-up. They called it some kind of hemotobin globin, er..." It's like a hard stick under his skin that runs from his wrist towards the ring finger on his right hand. It breaks into two strands as it approaches the knuckle, making the growth under his skin look like the letter 'Y.' It pulls his one finger back so it's constantly curled and he can't straighten it out, and it's getting worse.

He went to see the prison doctor about the problem. "They tell you flat out, they can't do nothing for you," said Elders. "Unless it's an immediate issue, they're not doing nothing for you. He said, well, I'll give you some aspirins, and I suggest you take care of it as soon as you can when you get out or you're going to end up like this, all crippled up, but there's nothing we're going to do for you here." Elders wasn't surprised by the 'treatment.' "That, to me, it's what I'm used to! It's the system. Everything's blamed on not enough money. What can you do with that? I have no kind of say so. If you back-talk anybody you're in trouble," said Elders. I took some of these stories to the guy in charge of Vandalia prison, Warden Victor Dozier. I told Dozier about Jessup, the guy who was told by the dentist that he had cavities and was also told that all they would do for him was pull the teeth. DOZIER: Really. WILDEBOER: Yeah. DOZIER: That's hard to believe but.... I also asked Dozier about Elders and the growth on his hand. Dozier said offenders can file grievances. That's the name for the formal complaint process in Illinois prisons. But in the next breath Dozier all but admitted that filing a grievance on a medical issue would be pointless. "If the doctor states, gives him a rational why he can't do it, I mean, he's our medical director. I can't question what he tells the offender," said Dozier. Admittedly, a corrections professional shouldn't be overruling the health care decisions of a medical professional. But then who does vet the health care decisions being made? In written statements given to WBEZ over the last several months, the Department of Corrections has said repeatedly that it oversees health care, holding, "monthly continuous quality improvement meetings." But the department has yet to provide someone who can explain exactly what happens at these meetings, who's involved or what information they're looking at. According to the prison watchdog group the John Howard Association no one seems to be providing meaningful oversight of prison health care. In fact, last year, the John Howard Association reported that the state entered into a more than $1.3 billion contract with a company called Wexford Health Sources without auditing the company's previous performance in the state. I asked Warden Dozier how he, as the top official at the Vandalia prison, ensures that Wexford is delivering the care that Illinois taxpayers have been paying for. "Okay, I don't have an answer for that," said Dozier. The lack of oversight has caught the attention of state Rep. Greg Harris. "Well, I've heard similar stories and actually worse, and I'm very concerned that we're paying about $1.3 billion dollars to a private company to manage health care in our prisons, and I want to look into are we getting quality health care for the folks for the money that we're paying," said Harris. Greg Harris has been looking into the health care contract. His interest was piqued by the John Howard Association report last year. Harris says his review of the contract shows that the deal is a good one as long as Wexford actually provides the care they're supposed to provide. "I mean we can't take the Department of Corrections word for it and we can't take the private company's word for it," said Harris. "I want somebody to go in and independently verify that people are being adequately treated." Harris is planning to hold a hearing on April 4th in Chicago to take a closer look at the contract. He's pushing to bring the National Commission on Correctional Health Care into Illinois prisons to provide independent oversight. Wexford declined to be interviewed for this story. In fact, the company with a billion-dollar public contract in Illinois has refused all of our requests for interviews. However, in a written statement, they said they provide medically necessary care as required by the constitution while at the same time acting as responsible stewards of taxpayer dollars. Wexford also says it welcomes Rep. Harris' push to bring a third party into the Illinois prisons to audit Wexford's performance.

Oct 11, 2012 The Associated Press
(Raleigh, NC) – Two guards at a private prison in North Carolina have been charged with accepting bribes to smuggle in cellphones and cigarettes. Rhonda Boyd and Raye Lynn Holley worked as correctional officers at Rivers Correctional Institution, a 1,450-bed prison in Winton, N.C. According to a federal criminal indictment made public Wednesday, Boyd is charged with conspiracy to commit bribery and acceptance of a bribe, while Holley is charged with accepting a bribe. The indictment alleges that the two had been smuggling contraband into the prison since early 2011. Rivers is a private prison owned by The GEO Group, Inc., a Florida-based company that contracts with the Federal Bureau of Prisons to house federal inmates and detainees. Many of the prisoners housed at the facility are from the District of Columbia.

October 9, 2012 WBEZ News
An Illinois state legislator is demanding answers about a huge healthcare contract for prison inmates. Democratic Rep. Greg Harris from Chicago's Northwest Side is pushing HR 1248, a House resolution calling for an official examination of how the state failed to audit Wexford Health Sources before signing a $1.4 billion contract with the private health care company last year. WBEZ has been reporting on poor health care in the prisons, and a recent report by the prison watchdog John Howard Association found that no one in the state is checking on Wexford to make sure they're providing the care they're being paid for. Harris's audit would change that. Harris says there are 250 lawsuits against the state right now alleging poor health care. He says he's been seeking proof that Wexford is actually earning the $115 million Illinois pays them every year, but he's not satisfied with what he's found. "I got a one-page response from the Department of Corrections saying they're doing it. To me that's just not adequate," said Harris. "We need to dig beyond what people tell us that there's no problem here, keep moving, there's nothing to see. We as legislators need to do our jobs and monitor these contracts." Harris says dollars are in short supply and there needs to be independent oversight of the enormous private contract. He says Wexford may be providing

Wexford Rap Sheet

...great care to Illinois inmates, but he wants an independent agency to make sure that's the case.

January 6, 2009 *The Pantagraph*
Unionized health care workers at 27 Illinois prisons are mulling whether to go on strike over wages. The 350-plus workers are employed by Wexford Health Sources of Pennsylvania, which recently received a two-year, $210 million extension in its contract to provide health care to inmates within the state's sprawling prison system. The health care workers represented by the American Federation of State, County and Municipal Employees union say they want a wage increase similar to a 4 percent boost the union recently inked with a different prison health care contractor. "Wexford should not have any difficulty meeting the pay and benefit levels of its competitors," AFSCME spokesman Buddy Maupin said Monday. The company, which has given embattled Gov. Rod Blagojevich $38,000 in campaign contributions since he took office, did not immediately respond to questions. The Illinois Department of Corrections said the matter, for now, is between the company and the union. "We hope they come to an agreement," said Corrections spokesman Derek Schnapp. It isn't the first time AFSCME has tangled with Wexford. Three years ago, union workers threatened to strike, raising the possibility that management-level health care workers would have to provide care to inmates. State officials averted the 2005 strike by firing Wexford and bringing in a new company. Wexford eventually was re-hired and received an extension to its contract in late December worth an additional $5 million over its previous deal.

July 30, 2008 *AP*
Fighting back tears and apologizing to his teenage daughters, the former head of the Illinois prison system was sentenced to two years in federal prison Wednesday for taking payoffs from lobbyists. "What I did was absolutely wrong," said Donald Snyder, who admitted pocketing $50,000 from lobbyists when he was director of the Illinois Department of Corrections. He said he hoped his conviction on the charges would not bias employers against his daughters when they grow up and look for jobs. "I'm sorry, girls," he said, turning to the bench where they were sitting. As he tried to finish his statement, his face turned dark red, he grimaced and was unable to speak. Judge James B. Zagel chastised Snyder, who pleaded guilty, volunteered to be a federal witness, secretly recorded corrupt conversations and testified at the trial of one of the lobbyists. "I didn't believe much of your testimony and I didn't believe much of your testimony because of your claimed lack of memory," Zagel told him. He said Snyder diminished the stature of government officials by setting a terrible example and making people doubt their integrity. "You hear over and over against that all government officials are corrupt," said Zagel, a one-time Illinois law enforcement director. Zagel brushed aside letters from Snyder's neighbors in downstate Pittsfield, vouching for him as someone well liked in the community. "You should have stayed in Pittsfield," Zagel said. Snyder admitted that he took $30,000 from Larry Sims, a lobbyist for two vendors. He said he pocketed up to $20,000 from two other lobbyists, former Cook County undersheriff John Robinson and Michael J. Mahoney. Sims and Robinson have pleaded guilty. Mahoney was acquitted in a bench trial before Zagel who said he didn't believe Snyder's testimony. The case drew the spotlight not only because of Snyder's position but because Mahoney had lobbied the prison system while executive director of the John Howard Association, a prison reform organization. At his trial, Mahoney admitted what he had done but argued that whatever the ethical lapses, he simply had not done anything illegal. Zagel agreed, though he said the defense was "inherently unattractive."

July 20, 2007 *Sun Times*
The former director of the Illinois Department of Corrections was indicted Thursday for allegedly taking $50,000 in illegal kickbacks to hand out state contracts to favored companies, including $20,000 in bribes from the former undersheriff of Cook County. The former undersheriff, John Robinson, who left his job under a cloud, had a side job as a lobbyist for companies such as Addus Health Care of Palatine, trying to get them state business. He succeeded in getting Addus a contract providing health-care services in Illinois prisons in part because he bribed then-state Corrections Director Donald Snyder with $20,000, according to the indictment. $30,000 in alleged bribes - "Addus Health Care has not had a relationship with Robinson for several years, is not accused of any wrongdoing, didn't know the alleged activity was taking place, and is assisting authorities every step of the way," said Dave Bayless, a company spokesman. Addusis referred to as "Company A" in the indictment. Also indicted Thursday was Larry Sims, a lobbyist who allegedly gave Snyder $30,000 in bribes so state business could go to an unnamed Pennsylvania health-care company. Snyder, 52, of Downstate Pittsfield, was director of the state prisons under former Gov. George Ryan, from 1999 until 2003. Thursday's indictments grew out of the Operation Safe Road probe of corruption in the Ryan administration. Robinson, 59, of Barrington Hills, was undersheriff of Cook County from 1991 until 2000. He resigned amid a grand jury probe of him allegedly using his undersheriff stationery to solicit business for a British Virgin Islands-based company that ran an alleged investment scam. He was never charged. Robinson was undersheriff for part of the time he allegedly passed money – in increments, totaling $20,000 – to Snyder. 5 counts of mail fraud - "John is in a proper manner facing his charges. He will do what is right," Robinson's lawyer, George Collins, said. Robinson is currently unemployed, Collins said. Sims, 58, of Downstate Pleasant Plains, was a lobbyist for several vendors, including the Pennsylvania company. Snyder and

County and Municipal Employees union reports its contract with Peoria-based Health Professionals Ltd. will result in better retirement benefits, cheaper health care costs and added benefits for education and length of service.

Faced with the prospect of having inadequate staffing levels in many of its prisons, the Illinois Department of Corrections dropped Wexford and its $83 million contract and brought in HPL, which was already providing health care services at nine other state prisons.

July 7, 2005 *Pantagraph*
A Pennsylvania-based company may sue the Illinois Department of Corrections after the agency abruptly canceled its contract to avert a labor strike. "We are looking at all our options," said Elaine Gedman, human resources chief of Pittsburgh-based Wexford Health Sources Inc. "This is totally unprecedented." The potential lawsuit comes in response to action the state took Sunday as the clock ticked down on a potential strike by nearly 380 nurses, pharmacists and other health-care professionals who work in the prison system but are employed through Wexford. The workers, represented by the American Federation of State, County and Municipal Employees Council 31, had threatened to walk off the job Tuesday if their contract demands were not met. Dozens of workers at prisons in Dwight, Pontiac and Lincoln are covered by the labor contract. But a strike was averted late Sunday when the state terminated its lengthy relationship with Wexford – worth about $83 million this year – and hired a second company to manage health care at the prisons. The affected workers, meanwhile, remain on the job while AFSCME attempts to negotiate a new labor agreement with the new contractor, Health Professionals Limited.

July 5, 2005 *State Journal Register*
The state has dropped its contract with Wexford Health Sources Inc. to provide health services at 23 state prisons on the eve of a scheduled strike by its employees. Department of Corrections spokeswoman Dede Short confirmed that an agreement had been reached between Corrections and Health Professionals Limited to take over the Wexford contracts, which were cancelled Monday. Health Professionals Limited is a private vendor that currently provides similar health services in nine prisons, according to representatives of American Federation of State, County and Municipal Employees Council 31, which represented the Wexford prison employees. As a result, the strike that had been scheduled to begin at 7 a.m. today, affecting more than 350 Wexford employees at 23 state prisons, has been put on hold, according to Anders Lindall, public affairs director for AFSCME Council 31. Negotiations broke off Friday between Wexford and the union. At the heart of the dispute is the difference in pay, health and other benefits between Wexford's employees and state workers, some of whom reportedly make twice as much as private vendor health employees doing similar jobs. Wexford's workers provided medical, dental and mental health services at nearly two dozen state prisons.

June 26, 2005 *Lincoln Courier*
More than 350 health care workers at Illinois prisons, including those at Lincoln and Logan correctional centers, will go on strike July 5 if contract negotiations between their union and their employer, Wexford Health Sources, fail to produce an agreement. Wexford has state contracts to provide health care at nearly two dozen correctional facilities. The union-represented Wexford workers voted 356-5 this week to authorize a strike, said Buddy Maupin, regional director for Council 31 of the American Federation of State, County and Municipal Employees. For instance, he said, Wexford employees at state prisons are paid "vastly inferior" wages compared with state employees doing the same work. Kirsten Lolling, a pharmacy technician at Lincoln Correctional Center, said she is paid $14 an hour, despite having 13 years of experience. State employees doing the same job are paid about twice as much, she said. "Philosophically, we don't think that the state should exploit its Wexford work force by using a low-wage, low-benefit vendor to save money on the labor costs," Maupin said.

June 24, 2005 *Copley News Service*
Frustrated by a lack of progress in contract talks, more than 350 workers who provide health care services to Illinois prison inmates have been taking strike-authorization votes, the results of which will be announced today. A contract between AFSCME and Pittsburgh, Pa.-based Wexford Health Sources Inc. expires at midnight June 30, AFSCME spokesman Anders Lindall said Thursday. Wexford has state contracts to provide health-care services at most Illinois prisons. Negotiations on a new contract started in April, but they have not gone smoothly, Lindall said. Wexford has proposed an "array of draconian takeback measures," including reductions in pay and benefits, he said.

August 18, 2003 *Sun Times News*
The union representing Illinois' 15,000 state prison employees is praising Governor Blagojevich's approval of legislation that would bar the privatization of prison commissary services. Illinois law already prohibits the privatization of all security functions in the state prisons. AFSCME Council 31 initiated the new measure after former Governor George Ryan made an aggressive effort to contract out commissary services in the state's 37 correctional facilities. Ryan contended that no security function was involved in the commissaries, which sell non-

essential goods to inmates at reduced prices. SB 629 makes explicit the prohibition against privatization of commissary services. It passed the General Assembly earlier this year by overwhelming majorities in both houses.

April 28, 2003 *Clinton Herald*
There's no money in the Illinois budget to staff and operate the Thompson prison next year but the state is exploring options for using that facility and other prisons not currently open. One option would be to turn those facilities into federal prisons. Doing so would require the Illinois Department of Corrections to first turn over the prisons to private companies to run, and the private companies would then lease the space to the federal prison system.

April 10, 2003 *The Southern Illinois*
Union picket lines could begin appearing as early as next week at eight Illinois Department of Corrections facilities because of stalled contract talks between health care workers and the private vendor that employs them. Health care workers have been without a contract since Dec. 31 and have set Monday as a strike date, said Mark Samuels, public affairs director for the American Federation of State, County and Municipal Employees, the state's largest public-service employee union. AFSCME Regional Director Buddy Maupin said Tuesday that HPL is one of three primary suppliers of health care services to the state corrections system. Wexford and Addus are the other two principal contractors. Maupin said HPL's contract proposals are not only "inferior" to wages and benefits earned by state employees in IDOC who provide the same services, but they are also below those paid by Wexford and Addus.